Government Exhibit 1

SHER TREMONTE LLP

**FRCP 11(f)/FRE 410(a) – FOR SETTLEMENT PURPOSES ONLY**

**BY EMAIL**

Patrick Gallagher, Assistant United States Attorney
United States Attorney's Office
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

**Re:** ***United States v. Maurice Patterson***
Case No. 26-CR-169 (WFK)

Dear Mr. Gallagher,

We write to respectfully request that your office defer its prosecution of our client, Maurice Patterson, or, in the alternative, resolve the case through a misdemeanor plea. As you know, an indictment was filed on May 5, 2026, charging Mr. Patterson with one count of a threat against a federal judge, in violation of 18 U.S.C. §§ 115(a)(1)(B) and (b)(4). Mr. Patterson does not dispute that he made the alleged statement that Judge Rakoff "is going to be pushing daisies," which forms the basis of this charge. And while Mr. Patterson has strong feelings regarding Judge Rakoff, as we set out in full below, Mr. Patterson neither made a "true threat," nor possessed the requisite intent to be guilty of the charged offense. Moreover, the unique facts and circumstances of Mr. Patterson's life illustrate that a felony prosecution is not warranted.

## I. Background

Mr. Patterson has lived an extraordinarily challenging life. His childhood has been dominated by foster homes, social workers, group homes, and shelters. His father was incarcerated when Mr. Patterson was an infant and died in prison in 2016. His mother began serving federal time when Mr. Patterson was approximately three years old and was subsequently deported to Jamaica when he was eleven. At 25, Mr. Patterson was arrested and charged, with others, for participating in a drug-trafficking conspiracy, and has been involved in the criminal justice system ever since.

Through Mr. Patterson's challenging childhood and extensive and traumatic exposure to various carceral systems, he has developed a strong distrust and suspicion of authority. He perceives the world in a unique way and has identified extreme dangers around him by remaining hyper-vigilant. Through his unique observation, he has identified Judge Jed S. Rakoff

of the Southern District of New York as the mastermind of a deep-state criminal enterprise that is responsible for hundreds, if not thousands, of murders and the forced prostitution of minors.

The nine years Mr. Patterson spent in medium-to-high-security federal prisons were traumatic and eroded his mental and physical health. Upon his release in 2019, he struggled to adjust to life on the outside. He had no money, no employment prospects, and only strained and few familial relationships. To make matters worse, Mr. Patterson discovered shortly after his release that his fifteen-year-old daughter ("ZD") had been forced into a prostitution ring at what he then believed was her mother's and grandmother's direction.

Mr. Patterson did everything he could to save ZD from this fate. He confronted ZD and ZD's mother about ZD's behavior, reported ZD's mother to Child Protective Services, and told anyone who would listen about the illegal conduct. But compared to the forces that were working against him, Mr. Patterson was powerless. In fact, every attempt to shine a light on these crimes resulted in greater danger for him. Because of Mr. Patterson's efforts, ZD's mother reported him to his probation officer, which led to a violation of supervised release hearing before Judge Rakoff.[1]

Through this experience, Mr. Patterson finally learned the truth—Judge Rakoff was the head of the deep state criminal conspiracy that had ensnared his daughter, and Judge Rakoff was furious with Mr. Patterson for attempting to expose them. Although Mr. Patterson alerted his trusted counsel to his discovery and expressed his concern that Judge Rakoff would kill him for attempting to reveal the truth, his former counsel disbelieved him and suggested he needed mental health treatment. Mr. Patterson deduced that Judge Rakoff, a wealthy, highly esteemed, and influential figure, had corrupted his lawyers and he cut ties with them.

The years that have followed this revelation have been the most challenging of Mr. Patterson's life. He lives in constant fear that one of Judge Rakoff's agents will complete their assigned mission and assassinate him, like they assassinated Javon Jones—a 29-year-old-man with whom Mr. Patterson served time, and who was shot in the back of his head. On one occasion, agents closed in on Mr. Patterson by drilling holes into the walls of his residence. Mr. Patterson remained inside, without food, for several days. Eventually, he was so hungry that

[1] The court determined that Mr. Patterson had violated the conditions of his supervised release by falsely reporting an incident in the third degree, in violation of New York State Penal Law § 240.50(4)(a), harassment in the second degree, in violation of New York State Penal Law § 240.26, and possessing 21.1 grams of marijuana. *See United States v. Patterson*, 10-cr-94 (JSR), Dkt. No. 261 (S.D.N.Y. Mar. 27, 2020). On May 15, 2020, Judge Rakoff sentenced Mr. Patterson to four months' imprisonment on the violation. *Id.* Dkt. No. 267. After sentencing, but prior to Mr. Patterson's surrender, Mr. Patterson and his ex-girlfriend had a violent altercation that resulted in a subsequent violation of his supervised release. Judge Rakoff then amended Mr. Patterson's sentence from four months to twelve months' imprisonment.

he called the police (whom he did not yet know were working directly for Judge Rakoff) for help. They sent an ambulance to his home, which scared the agents away.

But Mr. Patterson continues to observe Judge Rakoff's agents everywhere and they continue to hunt him. *See* USAO_00000002 (expressing agents are "all around him" and are "always trying to 'bother' him"). Indeed, Mr. Patterson is aware of attempts Judge Rakoff and his agents have made on his life while he has resided at the MDC—confined and under the supervision of government agents, all of whom report directly to Judge Rakoff. Since his arrival at MDC in May 2026, Mr. Patterson has survived a number of attacks: missile strikes, pepper spray disseminated through the vents, and prosecutors masquerading as inmates sent to antagonize Mr. Patterson and frame him for crimes he did not commit. Mr. Patterson estimates that 90% of his unit consists of agents trying to goad him into confessing to crimes he did not commit (compared to approximately 75% in his prior unit). Mr. Patterson has also endured psychological warfare initiated by Judge Rakoff. This includes frequent and hours long banging and screaming (done by agents) around his cell, as well as the appearance of other demonic forces Judge Rakoff controls in the bowels of MDC.

II. Offense Conduct

After years of learning about the various criminal schemes in which Judge Rakoff is involved, Mr. Patterson decided to try to expose him. On December 6, 2025, Mr. Patterson posted for the first time on Instagram about the "Rakoff Files," so named as a reference to the Epstein Files, given Mr. Patterson's understanding of the potential that exposure of the information would destroy Judge Rakoff's reputation. Between December 6 and April 17, 2025, Mr. Patterson repeatedly spoke out about Judge Rakoff online. During these four months, he made approximately forty Instagram posts that identify agents and call out Judge Rakoff's illegal conduct. *See, e.g.*, USAO_0000017 (Posting a photo of Judge Rakoff and commenting, inter alia, "Skilled in the art of Science and Murder"). All of these posts simply stated facts as Mr. Patterson saw them; none remotely could be characterized as a threat.

After learning that Judge Rakoff had killed Mr. Jones, one of Mr. Patterson's close friends, Mr. Patterson decided that protesting online was not raising enough awareness. On April 13, 2026, Mr. Patterson went to the Southern District of New York ("SDNY") with a large sign entitled, "THE RAKOFF FILE" to protest Judge Rakoff. USAO_0000007, USAO_0000035. DUSMs Lee and Belviz engaged with Mr. Patterson, asking about his sign. Mr. Patterson explained, in code, "It means I'm sleeping." *Id.* At this time, Mr. Patterson made several statements, including:

- Judge Rakoff "is a trillionaire pedophile who is responsible for getting [his] daughter addicted to crack and forced her into prostitution."
- Mr. Patterson was "unable to use his phone because a Jamaican Mossad agent infected [it.]"

- "[T]he government was conducting psychological operations against [Mr. Patterson,] such as[] spraying him with dump truck water to make him smell bad enough that no one would approach him; throwing bed bugs at him; sending transvestites to seduce him; and shooting him with poisoned 'microdarts'"
- Judge Rakoff had been trying to execute Mr. Patterson, and at Mount Sinai Hospital, Judge Rakoff walked into his hospital room and sat next to him in silence.

Mr. Patterson ended the conversation with the marshals and walked away because one of Judge Rakoff's agents at Homeland Security repeatedly called his cell phone. *Id.*

Four days later, On April 17, 2026, Mr. Patterson returned to the SDNY to protest Judge Rakoff. This time, Mr. Patterson documented his journey on social media, including by splicing a clip from the 2004 film, *Troy*, directed by Wolfgang Petersen.[2] Mr. Patterson attempted to enter the courthouse to protest inside but was denied entry for carrying two lighters. USAO_0000049. He left without incident and decided to protest outside, including by shouting Judge Rakoff's name, which got the attention of court personnel. USAO_0000050.

On this particular day, the courthouse had fewer patrons than Mr. Patterson had hoped—his opportunities to expose Judge Rakoff were limited to a court security guard (obviously corrupted) and an individual smoking a cigarette on the steps, who turned out to be a court reporter. Mr. Patterson approached the smoking individual and began informing him about Judge Rakoff's illegal conduct and advocating for the Judge's impeachment.[3] While the subsequent interview of the court reporter suggests he was not paying close attention to the information Mr. Patterson was conveying, Mr. Patterson has a clear recollection of what he said. Specifically, he revealed that Judge Rakoff is the head of a powerful criminal conspiracy that runs a prostitution ring and puts hits out on people like Mr. Patterson and other concerned citizens who try to expose him. He described some of Judge Rakoff's depraved sexual activity, including that he engages in prostitution and is a pedophile. USAO_0000001. Mr. Patterson explained that once the world learns about Judge Rakoff's crimes, he will be impeached. The

---

[2] The scene Mr. Patterson clipped was one in which the hero, Achilles, has just learned that Hector, Troy's greatest champion, had killed Achilles' companion Patroclus. Achilles screams "Hector" at the walls of Troy, challenging Hector to a fight. Mourning the loss of Mr. Patterson's close friend, Mr. Jones, this scene resonated with Mr. Patterson. But unlike the movie, Mr. Patterson understood that Judge Rakoff would never come out and face him or his allegations about the Rakoff files. Notably, Mr. Patterson did not have any weapons on him when he was arrested later that day, consistent with the fact that Mr. Patterson had no plans to attack Judge Rakoff—he wished only to expose him.

[3] This was the first person with whom Mr. Patterson had had a substantive conversation in several months. The conversation was approximately five minutes long. USAO_0000001.

stress and shame of the impeachment proceeding will weigh heavily on Judge Rakoff, and given his advanced age, could cause him to pass away (*i.e.*, he "is going to be pushing daisies."). USAO_0000001. At some unspecified point in this conversation, the court reporter stated that he is a court reporter who works for judges at the SDNY, including Judge Rakoff. USAO_0000004. After approximately five minutes, the court reporter gave Mr. Patterson a fist bump, wished him good luck, and went back inside. USAO_0000001.

Mr. Patterson concluded his protest and was headed back toward the Brooklyn Bridge when U.S. marshals arrested him. The marshals did not report any weapons on him. After being arrested, Mr. Patterson explained his situation: "I been protesting, [Rakoff] needs to be impeached. He has pedophilic photos of my daughter." USAO_00000002. He lamented that DUSMs (i.e., agents) were "all around him" and "always trying to 'bother' him." *Id.* The marshals reported that Mr. Patterson "was having thoughts that were not reality based and would go off on tangents about Yemen and imposters coming to America." USAO_00000002. Mr. Patterson was given a citation for disorderly conduct and was set to be transferred to Bellevue for a psychiatric evaluation, but the ambulance driver released Mr. Patterson several blocks from the hospital.[4] "There were no disruptions to U.S. Court operations at either Daniel Patrick Moynihan or the Thurgood Marshall Courthouses as a result of this incident." USAO_0000013 at 2.

Later that afternoon, Mr. Patterson returned to the Atlantic Armory Shelter, where he was living. Four days later, at approximately 5:20 A.M. members of the Marshals Service went to Mr. Patterson's residence to apprehend him. Upon arrival, the marshals spoke to Lead Security Officer Woods, who described Mr. Patterson as a "strange fellow [who is] always talking about aliens." USAO_0000052. Other unidentified staff "had similar remarks as Woods." *Id.* The marshals then went to Mr. Patterson's assigned bed, woke him up, arrested him, and seized his cell phone, which was charging across the room.

After being placed in the holding cell approximately three hours later, Mr. Patterson began yelling and shaking the cell gate. *Id.* He was screaming, "my heart hurts," and was crying. *Id.* Mr. Patterson lay in a fetal position near the toilet area of the cell and continued screaming the word "officer." *Id.* Supervisory Deputy United States Marshal Porcaro (Cellblock Supervisor) determined that Mr. Patterson required a fit for confinement determination from a hospital. *Id.*

## III. Mr. Patterson Lacked the Requisite Intent to Satisfy the Elements of 18 U.S.C. § 115(a)

Mr. Patterson's understanding and focus on Judge Rakoff's power and influence, as well as his perception that Judge Rakoff has sent agents to kill Mr. Patterson, is critical in this case because it directly reflects Mr. Patterson's intent. For Mr. Patterson's conduct to satisfy the

---

[4] Mr. Patterson disputes the marshals' report that he escaped from the emergency room and fled the scene. *See* USAO_0000051.

elements of 18 U.S.C. § 115(a), he must have threatened to murder Judge Rakoff with intent to impede, intimidate, or interfere with Judge Rakoff while he was engaged in the performance of official duties, or with intent to retaliate against Judge Rakoff on account of the performance of his official duties. Neither is the case here.

Mr. Patterson's prediction that Judge Rakoff will be pushing daisies is completely divorced from Judge Rakoff's performance of, or in retaliation to, his official duties. The comment describes Mr. Patterson's prediction of what will happen when all the illegal conduct that Judge Rakoff has been committing *outside* his official duties come to light. The distinction between official and unofficial duties is an important one in the context of a "true threats" analysis because the defendant must intend to influence or retaliate against an individual for his *official* conduct to be guilty. *See, e.g.*, *United States v. Fenton*, 30 F. Supp. 2d 520 (W.D. PA. 1998) (explaining that an alleged threat made to pressure an official to engage in *unofficial* conduct would not support a conviction under 18 U.S.C. § 115(a)). And here, there is no basis to infer that Mr. Patterson made the alleged statement with the requisite intent.

Mr. Patterson's focus on Judge Rakoff's unofficial duties is consistent with other statements Mr. Patterson made on and around that date, and for months beforehand. *See* USAO_0000022 (screenshot of Mr. Patterson's Instagram grid). At no point has Mr. Patterson complained about Judge Rakoff's determination that Mr. Patterson violated his supervised release, publicly or privately. His only concerns about Judge Rakoff relate to his sending agents to kill and harass Mr. Patterson, killing other civilians in Mr. Patterson's neighborhood, and coercing children, including Mr. Patterson's only daughter into a deep-state prostitution ring. This conduct, and this conduct alone, is why Mr. Patterson protests Judge Rakoff and seeks to expose him.

Even putting aside the reasons for Mr. Patterson's protest, the conduct here undermines, rather than establishes, his intent, because there is no evidence Mr. Patterson believed or intended that his statement would be conveyed to Judge Rakoff. *United States v. Fenton*, 30 F. Supp. 2d 520 (W.D. PA. 1998), is instructive. There, a jury convicted a defendant for threatening a congressman in violation of 18 U.S.C. § 115(a)(1)(B). On a motion for judgment of acquittal, the court set aside the jury verdict and acquitted the defendant for two reasons: (1) he did not make a true threat and (2) he lacked the requisite intent.

In *Fenton*, the defendant engaged in a heated conversation with an insurance adjuster about his 14-year-old truck, which Fenton believed had malfunctioned because it was defective. During the conversation, Fenton, who was described as "agitated" and "desperate," made death threats against the insurance adjuster, a U.S. congressman, and his aide—all of whom the defendant believed were engaged in a conspiracy against him. *Id.* at 522–23. Specifically, the defendant believed that the congressman "stole his ideas for an economic recovery plan that he had drawn up," and that as a result of this, the U.S. representative "would have to see that [the defendant was] either killed or commit[ted] suicide." *Id.* at 523. After explaining the conspiracy

the defendant believed was taking place, he told the insurance adjuster that "he was going to shoot Congressman Murtha's head off." *Id.* He further elaborated on his circumstances as follows:

> He said he had spoken to his pastor, and he had—he knows that God would forgive him for what he's going to do; that if the Government declares war on him, he was going to have to take a body count.... He said he was desperate, that he hadn't eaten for three days; that Congressman Murtha's trying to destroy his business and has succeeded in doing so. . . . [The defendant] told [the insurance adjuster] that he had been to Vietnam, he said, in 1975. He said that he had seen people die there, that he's not afraid to die. He said that he would kill until he's killed. He said that when he dies, there would be a tape, that he had produced a videotape. It would be disseminated to the press, it would be detrimental to Mr. Murtha. It would lay out the entire conspiracy.

*Id.* The defendant also instructed the insurance adjuster to tell CNN about the conspiracy, which the insurance adjuster said he would not do. *Id.* The insurance adjuster did say, however, that he would "not be able to keep this silent, that [he] would have to make a few calls." The defendant purportedly understood that to mean the insurance adjuster would be reporting him to authorities. *Id.* The defendant did not ask the insurance adjuster to convey the message to the congressman. *Id.* This fact was critical to the court's intent determination. It concluded that "it cannot seriously be concluded that [the defendant] had any intent to impede, intimidate or interfere with Congressman Murtha [because] Murtha was not 'in the audience' when Fenton spoke, and the government put on no evidence that Fenton intended his words to be conveyed to Murtha. One simply cannot be intimidated by speech of which he is unaware." *Id.* at 527 (citing *United States v. Snelenberger*, 24 F.3d 799, 803 (6th Cir. 1994) (overruled in part on other grounds)).

Like Fenton, Mr. Patterson did not ask (nor did he expect) that his statement be relayed to Judge Rakoff. Indeed, confronted with the limited options of a court security guard and a plain clothes' individual, Mr. Patterson sought to expose Judge Rakoff to the person least likely to be affiliated with him. Although the court reporter later revealed his connection to Judge Rakoff, Mr. Patterson was unaware of that connection when he disclosed Judge Rakoff's misdeeds and did not conclude the interaction with a request or understanding that the court reporter would convey Mr. Patterson's statements to Judge Rakoff.

The court in *Fenton* also evaluated whether Fenton's statements could be considered to have been made with the intent to retaliate against the congressman for his alleged conspiratorial conduct but concluded that "[a] threat that is never communicated to the victim and is not intended to be carried out by its speaker is no retaliation at all." *Id.* at 528. Rather, "it is the conveyance of the threat to the victim—and the fear and apprehension such a communication

carries with it—which constitutes the retaliation." *Id.* at 530. Here, Mr. Patterson's statement that Judge Rakoff "is going to be pushing daisies" was not conveyed to Judge Rakoff and was never intended to be. For this reason alone, Mr. Patterson's is not guilty of the charged crime.

IV. Mr. Patterson's Statement Does Not Constitute a "True Threat" Under 18 U.S.C. § 115(a)

Setting intent aside, Mr. Patterson is also not guilty of 18 U.S.C. § 115(a) because his alleged statement that Judge Rakoff "is going to be pushing daisies" is not a "true threat" under 18 U.S.C. § 115(a) where the statement was a prediction—not a statement of intent—and where the statement was not made to Judge Rakoff. Cases in which defendants have made similar statements illustrate this point.

In *United States v. Lincoln*, 403 F.3d 703 (9th Cir. 2005), the Ninth Circuit reversed a conviction under 18 USC § 871 for threatening President George W. Bush. While incarcerated at Oregon State Penitentiary, the defendant engaged in an anger management class that required him to write in a workbook. In doing so, he wrote a threatening letter to President Bush in which he predicted that Bush would die soon because "they" (referring to followers of Osama Bin Laden) said he would. Six months later, he attempted to mail the letter. On these facts, the Ninth Circuit held that the letter was not a true threat. Much like Mr. Patterson's statements during his protest of Judge Rakoff's unofficial activity, the defendant's letter was his way of stating opposition to President Bush, which the court deemed protected speech. *Id.* at 707. Relevant to the court's consideration was the district court's observation that, like Mr. Patterson's alleged statement, the letter "does not state or even suggest that the President *should* be killed," only that the statement expresses the opinion that he will be. *Id.* at 706. Based on this, the court concluded that no reasonable person could foresee the letter would be perceived by its recipient as a serious threat to the life of the President. *Id.*

Similarly, in *United States v. Bagdasarian*, 652 F.3d 1113, 1116 (9th Cir. 2011), the Ninth Circuit reversed a conviction under 18 U.S.C. § 879(a)(3) for threatening to kill then-presidential candidate Barack Obama two weeks before the election. On a Yahoo! Finance message board, the defendant posted: (1) Obama "will have a 50 cal in the head soon," and (2) "shoot the nig." The court condemned these statements as repugnant but nonetheless found that they were not threats, but predictions. *Id.* at 1115. Specifically, it concluded that the first statement did not convey an explicit or implicit threat the defendant himself would kill or injure President Obama, and the second was at most a statement intended to encourage others to take violent action, "if not simply an expression of rage or frustration." *Id.* at 1119. Mr. Patterson's statement about Judge Rakoff is more akin to (though less violent than) the first statement. His statement, "he is going to be pushing daisies" does not convey a threat that he would harm Judge Rakoff or an encouragement of anyone else to do so. It was a prediction Mr. Patterson made while expressing his frustration that Judge Rakoff has been deceiving the public and committing heinous crimes.

Finally, in *Fenton*, discussed above, the court found that the defendant's statements were not "true threats" because the remarks were spoken during a conversation with an unrelated third party, and because "no jury could find anything truly 'threatening' in Fenton's remarks because they could not influence [the U.S. official's] attitude or behavior in any way when spoken only to the [insurance adjuster]." 30 F. Supp. 2d at 526. Like Fenton, Mr. Patterson engaged in conversation with a third party who had no apparent connection to the U.S. official. Although the court opined that had Fenton accosted the official or written him a letter a true threat may have been intended, it specified that the determination would turn "on the words he used," in those interactions. *Id.* While Mr. Patterson has protested Judge Rakoff by shouting outside the courthouse and by posting online comments directed at him, the "words he used" in those instances were not threats.

We recognized, based on the way the complaint was drafted, that the government may argue that Mr. Patterson's past conduct with respect to his daughter and her mother provides contextual evidence that suggests his statement was a true threat. We expect vigorous litigation about the admissibility of this evidence, but for now it is worth noting that the threats Mr. Patterson is alleged to have made to these individuals ("I'm going to lay you out and make you taste grass"; "I'm going to fuck you up") are different in kind from the statement at issue here, not to mention the obvious differences between these individuals and Judge Rakoff.

V. <u>Proposed Resolution</u>

Based on counsel's review of discovery and our discussions with our client, we see no evidence of Mr. Patterson's guilt with respect to this offense. To the contrary, the evidence produced in discovery overwhelmingly confirms our understanding that Mr. Patterson did not have the requisite intent to commit this crime, and our review of applicable case law suggests the alleged statement does not qualify as a "true threat." Where, as here, the prosecution of a case is no longer in the interest of the United States, the case should be dismissed. *See, e.g.*, *United States v. Nicholas Matthew Scelfo*, 2:26-mj-09088 (Dkt. No. 13, Order for Dismissal) (dismissing a case where a defendant shouted clear, detailed, and violent threats directly to an ICE officer because it was not in the interests of the United States).

Should the United States have any lingering concerns about Mr. Patterson's conduct, a deferred prosecution would allow the government to impose conditions that could allay such concerns. *See* 18 U.S.C. § 3154. This could include, for example, restrictions on his contact with Judge Rakoff, keeping a certain distance from the courthouse, or mandatory participation in programming. *See, e.g.*, *United States v. Ploof*, 6:26-cr-6017, Dkt. No. 50 (W.D.N.Y. June 24, 2026) (criminal judgment for violation of 18 USC § 115(a)(1)(A) including special conditions that the defendant: (i) participate in mandatory programming, (ii) not have any contact, directly or indirectly, with the victim, the victim's family, and the victim's residence; and (iii) stay at least 500 yards away from the victim, the victim's family, and the victim's residence). Mr. Patterson is open to such conditions if it would mean that he can be released from the MDC.

Alternatively, we respectfully suggest that Mr. Patterson plead guilty to simple assault under 18 U.S.C. § 115(b)(1)(B)(i). To be guilty of a simple assault, a defendant must (1) make a threat to inflict injury, and (2) have apparent present ability that (3) causes a reasonable apprehension of immediate bodily harm. *United States v. Chestaro*, 197 F.3d 600 (2d Cir. 1999). Here, Mr. Patterson's shouting Judge Rakoff's name outside the courthouse could satisfy the first and second element, and Judge Rakoff's chambers' notifying the marshals of his conduct could satisfy the third. *See* USAO_0000011 (chambers notified marshals that Mr. Patterson was yelling "Rakoff" outside). Similar resolutions have been reached in cases with similar facts. *See, e.g.*, *United States v. Sampson*, 53 F.3d 343 (10th Cir. 1995) (pleading guilty to misdemeanor offense for obstruction of court orders under 18 U.S.C. § 1509, in exchange for dismissal of felony charges where the defendant telephoned his U.S. Representative and told an aide he would have to start "shooting" or "blowing people away" to get justice). While we maintain that a dismissal or deferred prosecution is appropriate in this case, Mr. Patterson is receptive to a misdemeanor plea in this case because he believes going to trial will expose all of Judge Rakoff's illegal activity—the shame of which would likely lead to a deterioration of Judge Rakoff's health and perhaps his death—which is something Mr. Patterson does not want on his conscience. Mr. Patterson would thus be willing to enter into an agreement to plead to a simple assault misdemeanor in order to avoid this outcome.

Accordingly, we respectfully submit that a deferred prosecution is an appropriate exercise of your discretion, but if you conclude that it is not, we ask that you consider allowing Mr. Patterson to plead to misdemeanor simple assault.

We appreciate your office's consideration.

Sincerely,

*<u>/s/ Noam Biale</u>*
Noam Biale
Krista Staropoli
Sher Tremonte LLP
90 Broad Street, 23rd Floor

*Attorneys for Maurice Patterson*